# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MATTHEW W. STURM,

*Plaintiff*,

v.

UNITED STATES DEPARTMENT OF
DEFENSE,

*Defendant*.

No. 24-cv-1298 (DLF)

## <u>MEMORANDUM OPINION</u>

Matthew Sturm was medically separated from the United States Navy in 1998 with a disability rating of 10%. While that rating entitled Sturm to severance pay, it fell short of the 30% rating required to qualify him for medical retirement and certain lifetime benefits. In 2020, Sturm submitted an application to the Board for Correction of Naval Records, requesting that the Board increase his disability rating to 30% and medically retire him from the Navy. The Board denied Sturm's application. Sturm filed suit in this Court, challenging the Board's decision under the Administrative Procedure Act.

Before the Court is Sturm's Motion for Summary Judgment, Dkt. 23, and the government's Cross-Motion for Summary Judgment, Dkt. 27. For the reasons that follow, the Court will deny Sturm's motion and grant the government's motion.

# I.     BACKGROUND

## A.     Legal Background

### 1.     *Navy Disability Evaluation System*

The Secretary of the Navy may retire or separate a servicemember if the Secretary determines that the member is "unfit to perform the duties of the member's office, grade, rank, or rating because of physical disability."  10 U.S.C. §§ 1201(a), 1203(a); *see Myles v. United States*, No. 21-1618C, 2022 WL 2296767, at *6 (Fed. Cl. June 24, 2022) ("physical disability" may include certain psychiatric and mood disorders).  The unfit servicemember is given a disability rating—a percentage rating that represents the extent to which the member's medical conditions render the member unfit. 10 U.S.C. § 1216a(b); *see id.* §§ 1201(b), 1203(b).  If the servicemember has fewer than 20 years of service, whether the member is retired or separated depends upon that rating.  *See id.* §§ 1201(b)(3), 1203(b)(4).  If the Secretary finds that the member's "disability is at least 30 percent under the standard schedule of rating disabilities," the member can qualify for retirement.  *Id.* § 1201(b)(3)(B).  If the Secretary finds that the member's disability falls below that 30% threshold, the member may be separated from the Navy.  *See id.* § 1203(a), (b)(4). "[Servicemembers] who are separated are entitled only to severance pay, while [servicemembers] who are retired receive, *inter alia*, lifetime retired pay, healthcare, and commissary privileges." *Sissel v. Wormuth*, 77 F.4th 941, 943 (D.C. Cir. 2023) (citation modified).

The Navy makes fitness and ratings determinations using a two-step process set forth in the Navy's Disability Evaluation System, as outlined in the Department of the Navy Disability Evaluation Manual (SECNAVINST).  *See generally* SECNAVINST 1850.4D.[1]  The first stage of

---

[1] Citations are to SECNAVINST 1850.4D, the Department of the Navy Disability Evaluation Manual in effect at the time of Sturm's medical evaluations and separation.  *Cf. Kelly v. United States*, 69 F.4th 887, 889 n.1 (Fed. Cir. 2023).

the process is typically conducted by a Medical Evaluation Board (MEB), "which is convened if a physician determines that a Navy member is unable to perform full military duty or unlikely to be able to do so within a reasonable period of time." *Havens v. Mabus*, 759 F.3d 91, 93 (D.C. Cir. 2024) (citation modified); *see* SECNAVINST 1850.4D §§ 3102, 3201.

If the Medical Evaluation Board finds a servicemember's "[f]itness for continued active service questionable by reason of physical or mental impairment," the Board refers the member to a Physical Evaluation Board (PEB). SECNAVINST 1850.4D § 3201(a). At the PEB stage, an informal PEB first reviews the member's record and issues preliminary findings regarding the member's fitness for duty, degree of disability, and entitlement to disability pay. *Id.* §§ 1004(b)–(c), 3102(b). "If the member accepts the preliminary findings, the case is finalized and service headquarters is requested to make an appropriate disposition (*i.e.*, separate, retire or return to duty)." *Id.* § 3102(b). If the member does not agree with the preliminary findings, the member may request a hearing before a formal PEB. *Id.*; *see id.* § 1004(c). The formal PEB conducts a hearing and makes recommended findings to the President of the PEB, who in turn issues a final determination. *Id.* § 1004(f).

"The sole standard to be used in making determinations of physical disability as a basis for retirement or separation is unfitness to perform the duties of the office, grade, rank or rating because of disease or injury incurred or aggravated while entitled to basic pay." *Id.* § 3301; *see id.* § 4302. If the PEB determines that a member is unfit for duty based upon one or more disabilities, the PEB must assign a compensable percentage disability rating for each unfitting condition. *See id.* §§ 3801–3802. Percentage ratings are determined pursuant to the standards set forth in the Department of Veterans Affairs' (VA) Veterans Administration Schedule for Rating

Disabilities (VASRD), *id.* § 3801(b), and are "based on the severity of the condition(s)," *id.* § 3802(a).

As explained *supra*, the member's disability rating determines the benefits and services to which the member is entitled upon discharge.

### 2.    *Correction Board*

A Navy servicemember who believes that his or her military record contains an "error" or "injustice" may request that the Secretary of the Navy correct the record.  10 U.S.C. § 1552(a).  The Secretary issues such corrections through the Board for Correction of Naval Records (Correction Board).  32 C.F.R. § 723.1.  The Correction Board "is not an investigative body."  *Id.* § 723.2(b).  Rather, "[i]ts function is to consider applications properly before it for the purpose of determining the existence of error or injustice in the naval records of current and former members of the Navy and Marine Corps, to make recommendations to the Secretary or to take corrective action on the Secretary's behalf when authorized."  *Id.*  In performing this function, the Correction Board "relies on a presumption of regularity to support the official actions of public officers and, in the absence of substantial evidence to the contrary, will presume that they have properly discharged their official duties."  *Id.* § 723.3(e)(2).  The Correction Board "may deny an application in executive session if it determines that the evidence of record fails to demonstrate the existence of probable material error or injustice."  *Id.*

### 3.    *Post-2008 Application of the VASRD*

In the National Defense Authorization Act (NDAA) for Fiscal Year 2008, Pub. L. No. 110-181, § 1642, 122 Stat. 3, 465 (codified at 10 U.S.C. § 1216a), Congress enacted a new statutory provision directing that the service branches "shall, to the extent feasible, utilize the schedule for rating disabilities in use by the Department of Veterans Affairs" (*i.e.*, the VASRD) and "may not

deviate from the schedule" unless doing so would result in a greater percentage of disability. At the time, Department of Defense Instruction 1332.39 (DoDI 1332.39) adopted some—but not all—of the ratings standards set forth in the VASRD. *See* DoDI 1332.39, Application of the Veterans Administration Schedule for Rating Disabilities ¶ 4.2 (Nov. 14, 1996) ("[N]ot all the general policy provisions in Sections 4.1–4.31 of the VASRD are applicable to the Military Departments. . . . This Instruction replaces these sections of of [*sic*] the VASRD."). As relevant here, DoDI 1332.39 provided that unfitting disability resulting from "Personality Disorder(s), Impulse Control Disorders, or Substance Use and/or Abuse Disorder(s)" were non-compensable conditions that should not be included in a servicemember's disability rating, and instructed that a member's "overall rating of psychiatric impairment . . . be reduced to the impairment rating that would be warranted in the absence of the influence of the non-compensable condition according to generally accepted medical principles." *Id.* ¶ 6.1. In response to the 2008 NDAA, the Department of Defense issued a memorandum rescinding DoDI 1332.39. *See generally* DoD Policy Memorandum on Implementing Disability-Related Provisions of the National Defense Authorization Act of 2008 (Pub L. 110-181) (Oct. 14, 2008) (2008 DoD Policy Memorandum).

### B.    Factual and Procedural Background

#### 1.    *Sturm's Medical History and Evaluations*

On February 2, 1987, Sturm enlisted in the Navy. A.R. 167. From 1989 to 1995, he served onboard the USS LAKE CHAMPLAIN (CG 57) and the USS JASON (ARS 8), deploying four times. A.R. 199. From 1995 to 1998, he was stationed at the Shipboard Intermediate Maintenance Facility in San Diego, California. A.R. 199. In April 1998, he reported aboard the USS GARY (FFG 51). A.R. 199.

On June 22, 1998, Sturm was admitted to the Naval Medical Center San Diego following a suicide attempt involving an overdose of Motrin tablets.  A.R. 73.  He reported that he felt as though "he [wa]s a bad father for having to leave his family and go to sea" and that "he d[id] not feel that he [wa]s able to handle the rigors of sea duty" and was "concerned" regarding the "upcoming change of [his] homeport to Japan" in light of his assignment to the USS GARY (FFG 51).  A.R. 73.  Sturm was diagnosed with Depressive Disorder Not Otherwise Specified and "Avoidant/Dependent Personality Traits."  A.R. 208.  Upon discharge, he was placed on limited duty.  A.R. 208.  As part of that limited duty, he was precluded from taking part in both "shipboard" and "overnight" work.  A.R. 208.

On August 3, 1998, Sturm returned to the inpatient ward at the Naval Medical Center San Diego, expressing suicidal ideation.  *See* A.R. 32.  The intake notes indicated that Sturm had "experienced great dissatisfaction with his job in the Navy" and that the "stress" of his work environment "appear[ed] to have contributed to a depressed mood."  A.R. 32.  He was admitted into the psychiatric unit for eight days.  *See* A.R. 32.  During that time, an MEB determined that Sturm was "unable to perform further military duties" and referred him to a PEB for a fitness determination.  A.R. 35.

Sturm was discharged from the psychiatric unit on August 11, 1998.  A.R. 32.  Although his "Initial Diagnostic Assessment" was "Adjustment Disorder with Mixed Anxiety and Depressed Mood" along with "Avoidant Personality Features," his "Discharge Diagnostic Assessment" was "Depressive Disorder [Not Otherwise Specified]" and "Histrionic [and] Narcissistic Personality Features."  A.R. 34–35.

Sturm was again psychiatrically hospitalized on November 12, 1998, "after expressing homicidal ideation toward his senior chief."  A.R. 453; *see* A.R. 36.  He was discharged on

November 20, 1998, with diagnoses of "Depressive Disorder [Not Otherwise Specified],"
"Anxiety Disorder [Not Otherwise Specified]," and "Personality Disorder Not Otherwise
Specified (Borderline, Narcissistic, and Passive-Aggressive Traits)."  A.R. 39; *see* A.R. 36.

On January 11, 1999, Sturm received a psychiatric evaluation after reporting to the Naval
Medical Center San Diego following a "verbal altercation in a parking lot."  A.R. 454; *see* A.R.
230–32.  He was discharged from emergency care the same day.  A.R. 232.

On January 13, 1999, an informal PEB found Sturm fit for duty by a vote of 2-1.  A.R. 19–
20, 454.  The panel was comprised of one medical officer and two line officers.  A.R. 454.  The
medical officer considered Sturm unfit for duty due to "Depressive Disorder."  A.R. 454.  The two
line officers, however, considered Sturm fit for service, with one noting that Sturm's reported
condition was "simultaneous with going to sea and change of homeport to Japan."  A.R. 454.

Sturm learned of the PEB's determination on January 19, 1999.  *See* A.R. 238.  That same
day, he reported to the Naval Medical Center San Diego, where he was psychiatrically hospitalized
until the following day.  *See* A.R. 238, 240–41.  His primary diagnosis was "Personality Disorder
Not Otherwise Specified," "with Depressive Disorder [Not Otherwise Specified] and Anxiety
Disorder [Not Otherwise Specified] considered secondary."  A.R. 455; *see* A.R. 241.

Sturm sought reconsideration of the PEB's findings, and, on February 24, 1999, the PEB
issued a decision finding Sturm unfit for service due to "Depressive Disorder [Not Otherwise
Specified]."  A.R. 13.  The PEB's notes stated that Sturm was "a disciplinary problem," "acting
out," and "determined to NOT go back to sea."  A.R. 18.  At the same time, however, the notes
acknowledged Sturm's prior diagnoses of Depressive Disorder and Personality Disorder, though
they stated that there was a "<u>strong</u> question" whether Sturm was experiencing "'real' depression
or personality disorder."  A.R. 18 (citation modified).  The PEB ultimately identified Sturm's

Depressive Disorder Not Otherwise Specified as an unfitting condition and assigned it a 10% disability rating.  A.R. 13.  It further found that Sturm's Anxiety Disorder "contribute[d]" to his Depressive Disorder and identified "Adjustment Disorder with Mixed Anxiety & Depressed Mood" as a condition that "d[id] not constitute a physical disability."  A.R. 13 (citation modified).

Sturm accepted the PEB's reconsidered findings on March 1, 1999, and waived a formal hearing.  *See* A.R. 15–16.  The President of the PEB subsequently issued a final decision finding Sturm unfit for service due to Depressive Disorder Not Otherwise Specified and assessing a 10% disability rating.  A.R. 7.

Sturm was medically discharged on March 25, 1999.  A.R. 167–68.

After receiving the PEB's 10% disability rating, Sturm submitted his medical records to the VA in order to secure disability compensation benefits.  *See* A.R. 243.  On May 14, 1999, the VA assigned Stum a 30% disability rating for "adjustment disorder with mixed anxiety and depressed moods."  A.R. 248; *see* A.R. 248–49.  In reaching this determination, the VA noted that "[a]n evaluation of 30 percent is granted whenever there is occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal), due to such symptoms as: depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, mild memory loss (such as forgetting names, directions, recent events)."  A.R. 249.

2.    *Sturm's Application to the Correction Board*

In 2020, Sturm submitted an application to the Correction Board, requesting that the Board increase his Navy disability rating to 30% and medically retire him from the Navy.  A.R. 147, 152. He argued that the PEB had violated 10 U.S.C. § 1216a by assessing a disability rating based on

the Navy's "own, more stringent rating criteria," rather than the criteria required by the VASRD, resulting in a lower compensable disability rating than that calculated under the VASRD.  A.R. 152.  In particular, he argued that, rather than applying the VASRD criteria in rating his psychiatric conditions—under which Sturm was entitled to a 30% disability rating if his condition caused "occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks," A.R. 249—the PEB applied an impermissibly stringent standard requiring "proof of actual interference with job performance of such severity as to result in a pattern of job loss, demotion, disqualification from obtaining employment, or inability to engage in or maintain reasonable employment," A.R. 161 (citation modified).

As part of its consideration of Sturm's application, the Correction Board received two advisory opinions.  *See* A.R. 3, 76, 452–59.  One of the advisory opinions—submitted by a Navy psychiatric advisor—concluded that, while the VA's "30% 'overall rating of psychiatric impairment' was appropriate," 20% of that overall rating was attributable to Personality Disorder and Adjustment Disorder, which the advisory opinion characterized as "non-compensable conditions."  A.R. 458.  In support of this conclusion, the psychiatric advisor's opinion noted that, under SECNAVINST 1850.4D—in place at the time of Sturm's PEB—not all medical conditions contributed to a servicemember's compensable percentage disability rating.  *See* A.R. 457–58.  In particular, the opinion noted that SECNAVINST 1850.4D instructed that "[p]ersonality disorder(s), impulse control disorders, or substance use and/or abuse disorder(s) [we]re examples of conditions not constituting a physical disability" and that unfitting disability resulting from such conditions was to be subtracted from a member's "overall rating of physical impairment," reducing the overall rating "to the impairment rating that would be warranted in the absence of the influence of the non-compensable condition according to generally accepted medical principles."  A.R. 458.

Applying SECNAVINST 1850.4D, the psychiatric advisor's opinion concluded that Sturm's 10% disability rating was appropriate.  A.R. 458.  Because "[t]he complete record show[ed] Personality Disorder was considered [Sturm's] primary diagnosis," it reasoned, Sturm's "overall psychiatric impairment [wa]s appropriately reduced to "a 10% rating for Depressive Disorder [Not Otherwise Specified] under VASRD Diagnostic Code 9499-9435 and a 20% rating for non-compensable Personality Disorder and Adjustment Disorder conditions."  A.R. 459.

In reaching this conclusion, the psychiatric advisor's opinion acknowledged that, "[w]hen it is not possible to separate the effects of the service-connected condition and the non-service-connected condition, VA regulations . . . require that reasonable doubt on any issue be resolved in the appellant's favor" and "clearly dictate that such signs and symptoms be attributed to the service-connected condition."  A.R. 458.  In Sturm's case, however, the psychiatric advisor's opinion concluded that "the record allow[ed] separation of the effects of compensable and non-compensable conditions," as demonstrated by the assignment of Personality Disorder as Sturm's "primary condition."  A.R. 458.

Finally, the psychiatric advisor's opinion rejected Sturm's argument that the PEB had imposed an "impermissible rating standard for the 30% ratings threshold applicable to psychiatric conditions," concluding that "there [wa]s neither evidence for or against the PEB applying this standard in its February 1999 adjudication."  A.R. 459.

On October 15, 2020, the Director for the Navy Council of Review Boards issued a letter concurring with the psychiatric advisor's opinion.  A.R. 76.  Like the psychiatric advisor's opinion, the Director's opinion concluded that, "while Enclosure 9 of SECNAVINST 1850.4D imposed an impermissibly high standard for the 30% rating threshold as applied to psychiatric conditions, there [wa]s neither evidence for or against the PEB applying this standard in its February 1999

adjudication." A.R. 76. "In fact," the Director's opinion noted, Sturm "had already demonstrate[ed] problematic employment within the Navy, despite the problematic standard." A.R. 76. As such, the Director's opinion concluded that "a 30% overall rating of psychiatric impairment [wa]s reasonable." A.R. 76. The opinion further concluded that, in light of Sturm's "primary" Personality Disorder diagnosis, that 30% overall rating was "appropriately reduced" to 10%. A.R. 76.

The Correction Board denied Sturm's application on December 14, 2020. A.R. 3–4.[2] In a letter, the Board noted that it "substantially concurred with the advisory opinions in [Sturm's] case." A.R. 4. In particular, "the Board agreed with the advisory opinions that [Sturm's] Depressive Disorder was properly rated at 10% since [his] personality and adjustment disorders must be deducted from [his] VA assigned rating of 30%." A.R. 4. In support of this conclusion, the Board noted that Sturm's "two most recent hospitalizations resulted in Personality and Adjustment Disorder diagnoses" and that his "primary diagnosis from the VA was for Adjustment Disorder vice Depressive Disorder," which "formed the basis for [his] 30% disability rating." A.R. 4. Because Sturm's "depression symptoms were included in the overall 30% VA rating for Adjustment Disorder," the Correction Board concluded, "the preponderance of the evidence support[ed] the PEB rating of 10% for [Sturm's] Depressive Disorder." A.R. 4. And, because Sturm's "Depressive Disorder did not separately qualify for a disability rating of 30% or greater, the Board determined [Sturm] did not qualify for placement on the disability retirement list." A.R. 4. As such, "the Board found insufficient evidence of error or injustice to warrant a change to [Sturm's] record." A.R. 4.

_____

[2] Although the Correction Board concluded that Sturm had not filed his application "in a timely manner," it "found it in the interest of justice to waive the statute of limitations and consider [Sturm's] case on its merits." A.R. 3.

3.      *Sturm's Complaint*

In May 2024, Sturm filed suit in this Court, challenging the Correction Board's decision under the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.  See* Compl., Dkt. 1. Sturm's complaint alleges that "[t]he Board's decision was arbitrary, capricious, unsupported by substantial evidence, and contrary to law because the Board unlawfully deviated from the required [VASRD] criteria and (instead) applied the [Navy's] own, more stringent, rating criteria, that resulted in a lower disability rating, in violation of 10 U.S.C. §§ 1201 and 1216a." *Id.* ¶ 1.  Sturm asks this Court to, *inter alia*, set aside the Correction Board's decision under 5 U.S.C. § 706(2)(A) and order the Secretary of the Navy "to correct [his] military records to reflect the correct combined disability rating to which he is entitled." *Id.* at 20.  The parties cross-moved for summary judgment on Sturm's claims.  *See* Pl.'s Mot. for Summ. J., Dkt. 23; Def.'s Opp'n & Cross-Mot. for Summ. J., Dkt. 27.

## II.      LEGAL STANDARDS

A court grants summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A "material" fact is one with potential to change the substantive outcome of the litigation.  *See Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  A dispute is "genuine" if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving party. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895.

In an APA case, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006).

The Court will "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "without observance of procedure required by law," *id.* § 706(2)(D), or "unsupported by substantial evidence," *id.* § 706(2)(E).

In an arbitrary and capricious challenge, the core question is whether the agency's decision was "the product of reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983). In answering this question, the Court "is not to substitute its judgment for that of the agency." *Id.* at 43. "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (citation modified). The Court, in turn, "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (citation modified).

"Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citation modified) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In this context, sufficient evidence "means—and means only— 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* at 103 (quoting *Consol. Edison Co.*, 305 U.S. at 229). Indeed, "an agency decision may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view." *Morall v. DEA*, 412 F.3d 165, 176 (D.C. Cir. 2005) (citation modified). The arbitrary and capricious standard of § 706(2)(A), however, is a "catchall" that generally subsumes the "substantial evidence" standard of § 706(2)(E). *Ass'n of Data Processing*

*Serv. Orgs., Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 745 F.2d 677, 683–84 (D.C. Cir. 1984); *accord Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 604 (D.C. Cir. 2007).

## III.    ANALYSIS

Sturm raises three arguments.  First, Sturm argues that the Correction Board's decision was contrary to law because the Board (1) unlawfully followed a formally rescinded provision of DoDI 1332.39; and (2) upheld an unlawful deviation from the VASRD by applying a Navy policy that resulted in a lesser disability rating.  Second, Sturm contends that the Correction Board's decision was arbitrary and capricious because the Board failed to adequately articulate its reasoning. Finally, Sturm asserts that the Correction Board's decision was not supported by substantial evidence because the Board ignored contrary record evidence.

The Court will address each argument in turn.

### A.    Forfeiture

At the outset, the government argues that the Court should "disregard" Sturm's "assertion that 'the Board committed legal error' by relying on the [SECNAVINST] 1850.4D's direction that a Medical Board and Physical Board can account for compensable and non-compensable conditions," Def.'s Opp'n & Cross-Mot. for Summ. J. 10 (quoting Pl.'s Mem. in Supp. of Mot. for Summ. J. (Pl.'s Mem.) 19), because Sturm did not raise that argument in his application to the Correction Board, *id.* at 11 (citing A.R. 159–63).  Sturm, for his part, contends that he did not have an opportunity to raise the argument until the Correction Board erroneously applied SECNAVINST 1850.4D to his application.  *See* Pl.'s Reply & Opp'n at 4–5.

The Court agrees with Sturm.  In his brief to the Correction Board, Sturm argued that the PEB "violated 10 U.S.C. § 1216a" by providing him "with a disability rating based on its own, more stringent, rating criteria instead of the required [VASRD]."  A.R. 152.  Before this Court,

Sturm argues that the Board repeated that error twice over—first by upholding the PEB's unlawful deviation from the VASRD and again by itself following the rescinded DoDI 1332.39. *See* Pl.'s Mem. 18–22. Having clearly presented before the Correction Board the argument that the PEB unlawfully deviated from the VASRD, Sturm was not required to identify preemptively the universe of provisions with which the Board need comply to avoid the same alleged error. Put differently, Sturm argued that the PEB—and, in turn, the Board—was legally obligated to apply the disability rating criteria set forth in the VASRD; it was not until the Board itself deviated from the VASRD that Sturm had an opportunity to object to that deviation. *Cf. United States. v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952) ("[O]rderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has opportunity for correction in order to raise issues reviewable by the courts."). As such, Sturm did not forfeit his argument as to SECNAVINST 1850.4D.

### B.    Contrary to Law

Sturm argues that the Correction Board's decision was contrary to law because the Board (1) unlawfully applied a deviation from the VASRD based on a provision of SECNAVINST 1850.4D modeled after the rescinded DoDI 1332.39; and, correspondingly, (2) upheld an unlawful deviation from the VASRD by applying a Navy policy—SECNAVINST 1850.4D—that resulted in a lesser disability rating. Pl.'s Mem. 18–22. Both arguments fail.

### 1.    *SECNAVINST 1850.4D*

Sturm asserts that the Correction Board unlawfully "applied a deviation from the VASRD that was expressly banned by the [Department of Defense] in 2008 when it rescinded DoDI 1332.39." Pl.'s Mem. 19. In particular, Sturm contends that the Board "committed legal error" by "substantially concurring" with the advisory opinion's application of SECNAVINST 1850.4D,

which required Sturm's "overall rating of psychiatric impairment" to be "reduced to the impairment rating that would be warranted in the absence of the influence of the non-compensable condition."  *Id.* (citation modified).  Because SECNAVINST 1850.4D "derived from" DoDI 1332.39, Sturm argues, application of SECNAVINST 1850.4D "became unlawful" once the Department of Defense rescinded DoDI 1332.39 in 2008.  *Id.*

This argument ignores the basic principle that the Correction Board must apply the policies and regulations in place at the time of the servicemember's discharge.  *See Chambers v. United States*, 417 F.3d 1218, 1227 (Fed. Cir. 2005); *Bee v. United States*, No. 21-1970, 2024 WL 3912596, at *5 n.4 (Fed. Cl. Aug. 23, 2024).  Here, there is no dispute that SECNAVINST 1850.4D was the Navy Disability Evaluation Manual in place at the time of Sturm's medical evaluations and discharge.  As such, SECNAVINST 1850.4D was the manual applicable to the Correction Board's review of Sturm's 1998 separation.

The 2008 recission of DoDI 1332.39 does not affect this analysis.  To start, that recission did not itself rescind SECNAVINST 1850.4D, which the Navy had previously cancelled and replaced with SECNAVINST 1850.4E in 2002.[3]  Thus, the operative question is not whether SECNAVINST 1850.4D, or any portion thereof, had been rescinded at the time of Sturm's Correction Board review.  It had.  Rather, the operative question is whether the Department of Defense's 2008 recission of DoDI 1332.39 prohibited the Correction Board from applying SECNAVINST 1850.4D.

It did not.  "Retroactivity is not favored in the law."  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).  As such, "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result."  *Id.*  Nothing in

---

[3] SECNAVINST 1850.4F cancelled and replaced SECNAVINST 1850.4E in 2019.

the text of 10 U.S.C. § 1216a—which prompted the recission of DoDI 1332.39—indicates that Congress intended the statutory provision to apply retroactively to all prior disability rating determinations. Nor does anything in the 2008 Department of Defense policy memorandum rescinding DoDI 1332.39 suggest the same. *See* 2008 DoD Policy Memorandum.[4]

This conclusion is bolstered by the fact that Congress in the 2008 NDAA also established a specific correction board—the Physical Disability Board of Review (PDBR)—to "address the disparities in the disability ratings issued by the military departments in the Department of Defense and the VA" to a defined subset of servicemembers. *Sissel*, 77 F.4th at 944 (citation modified). The PDBR is tasked with reviewing the disability determinations of servicemembers who, between September 11, 2001, and December 31, 2009, were "separated from the armed forces due to unfitness for duty due to a medical condition with a disability rating of 20 percent disabled or less" and "found to be not eligible for retirement." 10 U.S.C. § 1554a(b); *see id.* § 1554a(a); *Coleman v. Kendall*, 74 F.4th 610, 613–14 (4th Cir. 2023) (describing the PDBR process as a "retroactive review[]"). Department of Defense Instruction 6040.44 (DoDI 6040.44) guides the PDBR's review. In 2009, the Department of Defense revised DoDI 6040.44 to "expressly provid[e] that DoDI 1332.39 does not apply to the [PDBR's] review of a service member's disability rating if that service member was separated from the military prior to January 28, 2008." *Hatmaker v. United States*, 117 Fed. Cl. 560, 576 (2014) (citing DoDI 6040.44 encl. 3 ¶ 5.e.(1)). Today, DoDI

---

[4] Sturm suggests that application of the 2008 Department of Defense policy memorandum—and its recission of DoDI 1332.39—to the Correction Board's review would not be retroactive. *See* Pl.'s Reply & Opp'n 6–7. He bases that argument, in part, on the premise that application of the memorandum would not "impair the rights of, increase the liability of, or impose new legal consequences on the Government because the Board was already prohibited from applying DoDI 1332.39 in any review." *Id.* at 6. That reasoning, however, merely assumes its conclusion. The very question before the Court is whether the Correction Board was prohibited from applying DoDI 1332.39 or Department of the Navy Disability Evaluation Manual provisions based thereon.

6040.44 instructs that "[t]he PDBR will conduct reviews of the disability rating(s) of the covered individual in accordance with the VASRD in effect at the time of separation." DoDI 6040.44 encl. 3 ¶ 4(f). It further specifies that "[a]ny [Department of Defense] provisions, Military Department regulations, or guidelines inconsistent with the VASRD in effect at the time of the former Service member's separation will not be considered by the PDBR." *Id.* encl. 3 ¶ 4(f)(2).

The PDBR is instructive in two ways. First, while the Department of Defense specifically revised DoDI 6040.44 to clarify that DoDI 1332.39 does not apply to the PDBR's review, Sturm has pointed to no similar revisions to the guidance and policies governing military correction boards. Second, if Congress had intended 10 U.S.C. § 1216a to apply to military correction boards' review of all disability ratings, there would have been no need for Congress to establish a special review board for a subset of discharged servicemembers. Section 1216a alone would have sufficed.

Sturm's counterarguments are unpersuasive.

First, Sturm argues that the 2008 memorandum rescinding DoDI 1332.39 makes clear that "reliance on DoDI 1332.39 was improper and could not be used by the [Correction] Board moving forward." Pl.'s Reply & Opp'n 6; *see* Pl.'s Mem. 19. But nothing in the memorandum references the Correction Board or purports to alter the Board's practice of applying the policies and regulations that were in place at the time of the servicemember's discharge. *See Chambers*, 417 F.3d at 1227. Instead, in implementing the 2008 NDAA's recission of DoDI 1332.39, the memorandum revised policies and instructions guiding the *initial* disability evaluation process itself. *See* 2008 DoD Policy Memorandum (revising DoDI 1332.18, Separation or Retirement for Physical Disability (Nov. 4, 1996), and DoDI 1332.38, Physical Disability Evaluation (Nov. 14, 1996)). The memorandum thus does not suggest that it was the "settled expectation" that DoDI

1332.39 "could not factor into the [Correction] Board's consideration." Pl.'s Reply & Opp'n 6. *Contra id.* at 6–7.

Second, Sturm invokes DoDI 6040.44 and *Hatmaker v. United States*, 117 Fed. Cl. 560 (2014), to argue that "DoDI 1332.39 does not apply to a Board's review of a service member's disability rating if that service member was separated from the military prior to January 28, 2008." Pl.'s Reply & Opp'n 6 (citation modified) (quoting *Hatmaker*, 117 Fed. Cl. at 576). But, as explained, DoDI 6040.44 guides the PDBR's review, not the Correction Board's. And *Hatmaker* involved review of a PDBR decision. *See Hatmaker*, 117 Fed. Cl. at 563. As such, neither authority is instructive here.

Finally, Sturm argues that, because "DoDI 1332.39 was *never* lawful" and "should not have been implemented at the time of [Sturm's] discharge, the Navy may not apply it now." Pl.'s Reply & Opp'n 7; *see id.* at 8 ("[A]pplying DoDI 1332.39's unlawful deviations from the VASRD to any service member's record was wrong in 1999 and is wrong now."). The Correction Board, however, did not apply DoDI 1332.39 to its review of Sturm's disability rating; it applied SECNAVINST 1850.4D. True, Sturm argues that SECNAVINST 1850.4D "derived from DoDI 1332.39." Pl.'s Mem. 19. But he nowhere argues that SECNAVINST 1850.4D was unlawful when implemented. Indeed, he appears to contend that application of SECNAVINST 1850.4D became unlawful only once DoDI 1332.39 was rescinded. *See id.*

In any event, this argument is forfeited. In his memorandum in support of his motion for summary judgment, Sturm argued that the application of "DoDI 1332.39 (even as set forth in SECNAVINST 1850.4D) *became unlawful once the [Department of Defense] issued the 2008 DoD Disability Memo, and was expressly prohibited by DoDI 6040.44.*" *Id.* (emphasis added). He offered no argument that DoDI 1332.39 was unlawful *ab initio*. Rather, that argument appears

for the first time in Sturm's combined reply and opposition. And, even then, Sturm provides no explanation for his shift in position. Because Sturm failed to raise the argument in support of his motion for summary judgment—and in light of the unexplained shift between Sturm's conflicting legal theories—the Court finds the argument forfeited. *See Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008) (arguments raised for the first time in reply are forfeited); *Jones Lang LaSalle Ams., Inc. v. NLRB*, 128 F.4th 1288, 1297 (D.C. Cir. 2025) ("[A] litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." (citation modified)).

### 2. *Deviation Resulting in Lesser Disability Rating*

Sturm further argues that the Correction Board "upheld an unlawful deviation from the VASRD by applying Navy policy that resulted in a lesser [disability rating]." Pl.'s Mem. 20 (citation modified). In particular, Sturm contends that 10 U.S.C. § 1216a prohibits the Correction Board from deviating from the VASRD unless "the utilization of such criteria will result in a determination of a *greater percentage* of disability than would be otherwise determined through the utilization of the schedule." *Id.* (emphasis in original) (quoting 10 U.S.C. § 1216a). Here, he argues that the Correction board failed to follow the VASRD because it did not (1) "rate mental health disorders under the rating criteria of 38 C.F.R. § 4.130"; or (2) adhere to 38 C.F.R. § 3.102's requirement that reasonable doubt be resolved in his favor. *Id.*

As to the first argument, Sturm contends that, in concluding that his Depressive Order did not alone qualify for a disability rating of 30% or greater, the Correction Board applied a more stringent standard than that set forth in 38 C.F.R. § 4.130. *See id.* at 20–21 (contrasting VASRD standards for 10% and 30% disability ratings). In support of this argument, Sturm notes that the VA provided him with a 30% disability rating, "analyzing the same record as the Board, *without*

subtracting for [his] allegedly non-compensable conditions." *Id.* at 20 (emphasis in original); *see* Pl.'s Reply & Opp'n 2 ("The VASRD only assigns a *single* disability rating for mental disorders." (emphasis in original)). Rather than follow 38 C.F.R. § 4.130, he argues, the Correction Board "applied the Navy's own criteria as set forth in SECNAVINST 1850.4D, which applied the rescinded DODI 1332.39 provision reducing the 'overall rating of psychiatric impairment' to reflect the 'impairment rating that would be warranted in the absence of the influence of the non-compensable condition.'" Pl.'s Mem. 20 (quoting SECNAVINST 1850.4D, § 3802). That reduction, he concludes, was legal error in violation of 10 U.S.C. § 1216a.

This argument fails for reasons already stated. Nothing in Section 1216a requires retroactive application of the VASRD to all disability determinations made prior to the provision's enactment in 2008. As such, the Correction Board's application of the instruction in effect at the time of Sturm's discharge—which required Sturm's "overall rating of psychiatric impairment" to be "reduced to the impairment rating that would be warranted in the absence of the influence of the non-compensable condition," SECNAVINST 1850.4D, § 3802(h)—did not constitute legal error.

Sturm further argues that the Correction Board failed to adhere to 38 C.F.R. § 3.102's requirement that "reasonable doubt" regarding degree of disability "be resolved in favor of the claimant." 38 C.F.R. § 3.102; Pl.'s Mem. 21–22. In support of this argument, he asserts that the advisory opinions on which the Correction Board relied failed to address his multiple depression diagnoses and that the Board, in turn, simply accepted the opinions' conclusion that Sturm's record allowed for "separation of the effects of compensable and non-compensable conditions." Pl.'s Reply & Opp'n 4; *see* Pl.'s Mem. 21–22.

The record undercuts Sturm's argument. After engaging in a detailed review of Sturm's medical history, the psychiatric advisor's opinion acknowledged that, when it is not possible to separate compensable and non-compensable conditions, 38 C.F.R. § 3.102 "require[s] that reasonable doubt on any issue be resolved in the [servicemember's] favor." A.R. 458. The opinion concluded, however, that Sturm's medical record "allow[ed] separation of the effects of compensable and non-compensable conditions," as reflected in the "assignment of the Personality Disorder as the primary condition." A.R. 458. The Board "substantially concurred" with that conclusion, finding that "substantial evidence" supported the PEB's 10% rating for Sturm's Depressive Disorder and 20% rating for his Personality and Adjustment Disorder diagnoses. A.R. 4; *see Annicelli v. Kendall*, No. 20-CV-02647, 2022 WL 951268, at *5 (D.D.C. Mar. 30, 2022) ("Military corrections boards may meet their obligation to provide a 'reasoned explanation' for their decisionmaking by referencing or incorporating the reasoning of an advisory opinion or other sources."); *Roberts v. United States*, 741 F.3d 152, 158–59 (D.C. Cir. 2014) (similar). *Contrast, e.g.*, *Mittleider v. West*, 11 Vet. App. 181, 182 (1998) ("In this case, there is no medical evidence in the record separating the effects of the appellant's service-connected PTSD from his personality disorders.").

Sturm does not explain how his "multiple depression diagnoses" give rise to reasonable doubt regarding the separability of his compensable and non-compensable diagnoses. Pl.'s Mem. 22. True, "Sturm received depressive diagnoses at least four times." *Id.* But diagnosis frequency is distinct from diagnosis divisibility—the fact that Sturm was repeatedly diagnosed with Depressive Disorder does not undermine the Correction Board's conclusion that his Depressive Disorder could be separated from his non-compensable conditions. As such, Sturm has not identified any "reasonable doubt" to be resolved in his favor. 38 C.F.R. § 3.102.

C.       Arbitrary and Capricious

Sturm further argues that the Correction Board's decision was arbitrary and capricious because the Board "failed to adequately articulate": "(1) how through anything other than speculation, it was able to determine which of his mental health symptoms were attributable to [his] Depressive Disorder NOS and which were attributable only to his non-compensable conditions; (2) how it grappled with the fact that the VA, at the time of [his] discharge, had been unable to separate his symptoms by conditions; (3) how [his] Adjustment Disorder and Personality Disorder was cumulatively rated at 20%, and what percentage was attributable to each condition; or (4) how a 10% rating for his Depressive Disorder was proper pursuant to 38 C.F.R. § 4.130." Pl.'s Mem. 23.

The Correction Board provided a reasoned analysis of its determination that the preponderance of the evidence supported the PEB's reduction of Sturm's overall disability rating. The Board "substantially concurred" with the advisory opinions' conclusion that Sturm's "Depressive Disorder was properly rated at 10%" in light of the fact that his "personality and adjustment disorders must be deducted from [his] VA assigned rating of 30%." A.R. 4. In reaching this conclusion, the Board explained that Sturm's "two most recent hospitalizations resulted in Personality and Adjustment Disorder diagnoses," and pointed out that Sturm's "primary diagnosis from the VA was for Adjustment Disorder vice Depressive Disorder." A.R. 4; *see* A.R. 458 ("In the present matter, the record allows separation of the effects of compensable and non-compensable conditions. This is most clearly established by Dr. Bennett's assignment of the Personality Disorder as the primary condition."). Because that primary diagnosis formed the basis of Sturm's 30% disability rating—*i.e.*, Sturm's "depression symptoms were included in the overall 30% VA rating for Adjustment Disorder"—the Board "concluded that the preponderance of the

evidence support[ed] the PEB rating of 10% for [Sturm's] Depressive Disorder." A.R. 4. Put differently, the Board's reasoning, as reflected in the Board's decision and the advisory opinions on which it relied, proceeded as follows:

- The VA assigned Sturm a 30% disability rating.

- That rating, however, accounted for all of Sturm's psychological disorders, including Depressive Disorder, Adjustment Disorder, and Personality Disorder.

- Only Depressive Disorder was a compensable condition.

- When a servicemember's compensable and noncompensable conditions are separable, SECNAVINST 1850.4D requires noncompensable conditions to be subtracted from the servicemember's disability rating.

- Sturm's diagnoses were separable, and Depressive Disorder was not Sturm's primary diagnosis, as evidenced by the fact that: (1) a psychiatrist previously assigned Personality Disorder as Sturm's primary condition; (2) Sturm's most recent hospitalizations resulted in Personality and Adjustment Disorder diagnoses; and (3) Sturm's primary diagnosis from the VA was for Adjustment Disorder vice Depressive Disorder.

- Thus, the preponderance of the evidence supported the PEB's reduction of Sturm's overall disability rating to account for only Sturm's Depressive Disorder.

This analysis reflects "reasoned decisionmaking." *Haselwander v. McHugh*, 774 F.3d 990, 996 (D.C. Cir. 2014) (citation modified). The Board "examine[d] the relevant data and articulate[d] a satisfactory explanation," drawing a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (citation modified). Its reasoning was both "reasonable and reasonably explained." *Nw. Corp. v. FERC*, 884 F.3d 1176, 1179 (D.C. Cir. 2018). No more is required under the APA.

Sturm contests the Correction Board's apportionment of the 30% disability rating amongst his various conditions. *See* Pl.'s Mem. 22–25. This argument takes two forms. First, Sturm appears to dispute the Correction Board's determination that his conditions were separable. Second, he argues that the Board did not provide a reasoned explanation for affirming the PEB's

decision to assign his Depressive Disorder a 10% disability rating. Neither argument is ultimately successful.

The Board adequately explained its finding that Sturm's diagnoses were separable. After conducting a thorough review of Sturm's medical history, *see* A.R. 452–57, the psychiatric advisor's opinion detailed the manner in which each of Sturm's three diagnoses manifested in his behavior, *see* A.R. 458. The opinion then made a specific finding that Sturm's medical record "allow[ed] separation of the effects of [Sturm's] compensable and noncompensable conditions," as reflected in a psychiatrist's 1999 assignment of Personality Disorder as Sturm's "primary condition." A.R. 458. The Correction Board was entitled to rely on the opinion's conclusion that Sturm's "PEB record show[ed] specific contemplation of both the Depressive Disorder and Personality Disorder" and that "[t]he complete record show[ed] Personality Disorder was considered the primary diagnosis." A.R. 459; *see Roberts*, 741 F.3d at 158–59.[5] And it was reasonable for the Correction Board to conclude that diagnoses that could be categorized into primary and secondary conditions were also separable. Sturm has not identified a "clear error of judgment" regarding that determination. *State Farm*, 463 U.S. at 52.

Sturm next argues that the Board did not clearly explain the percentages attributable to each of his conditions. The Court agrees. Although the Correction Board acknowledged that

---

[5] Sturm disputes the Correction Board's characterization of the VA's diagnosis as "Adjustment Disorder vice Depressive Disorder," A.R. 4, arguing that "the VA's actual diagnosis was for 'adjustment disorder with mixed anxiety and depressed moods,' without any separation out of depression and anxiety from the overall diagnosis," Pl.'s Mem. 24 (quoting A.R. 249). But the Correction Board's decision elsewhere stated that the VA "assigned [Sturm] a 30% disability rating for Adjustment Disorder with mixed anxiety and depressed moods," A.R. 4, suggesting that the Board did not perceive a difference between that formulation and "Adjustment Disorder vice Depressive Disorder." Furthermore, the fact that the VA provided Sturm with a single rating for his psychiatric conditions does not, standing alone, indicate that those conditions were not separable, and Sturm does not point to anything in the VA's report explicitly stating that the VA found that they were not.

Sturm had been diagnosed with Adjustment Disorder, Personality Disorder, and Depressive Disorder, it provided Sturm with only two ratings: 10% for his Depressive Disorder, and 20% for his remaining non-compensable conditions.  A.R. 4.  Furthermore, while the Board suggested that Sturm's Depressive Disorder was entitled to a lesser rating than his Adjustment Disorder, *see* A.R. 4 (noting that Sturm's "*primary* diagnosis from the VA was for Adjustment Disorder vice Depressive Disorder" (emphasis added)), it did not explain the basis of the percentage ratings for each condition.  As such, the Board neither specifically allocated percentage contributions to Sturm's Adjustment Disorder and Personality Disorder nor articulated why the preponderance of the evidence supported the PEB's 10% and 20% ratings.

Any error, however, was harmless. *See Air Canada v. DOT*, 148 F.3d 1142, 1156 (D.C. Cir. 1998) ("As incorporated into the APA, the harmless error rule requires the party asserting error to demonstrate prejudice from the error." (citing 5 U.S.C. § 706)).  The logical implication of the Board's determination that Sturm's conditions were separable is that only a portion of Sturm's overall 30% disability rating is attributable to Sturm's Depressive Disorder.  And, if Sturm's disability rating for Depressive Disorder is less than 30%, that rating is not sufficient to qualify Sturm for retirement. *See* 10 U.S.C. § 1201(b)(3)(B).  As such, "it would be senseless to vacate and remand for reconsideration," *PDK Labs., Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004)—any allocation of Sturm's 30% disability rating among his three conditions will result in the same determination that Sturm is not retirement eligible.

### D.    Substantial Evidence

Finally, Sturm contends that the Board's decision was unsupported by substantial evidence because it "ignored the numerous instances in which physicians diagnosed [Sturm] with

Depressive Disorder [Not Otherwise Specified] and assessed all of his behavior and symptoms as depression-related." Pl.'s Mem. 23.

For the reasons already stated, the Correction Board's decision was supported by substantial evidence. *See Ass'n of Data Processing Serv. Orgs.*, 745 F.2d at 683–84 ("When the arbitrary or capricious standard is performing that function of assuring factual support, there is no substantive difference between what it requires and what would be required by the substantial evidence test, since it is impossible to conceive of a 'nonarbitrary' factual judgment supported only by evidence that is not substantial in the APA sense."). Sturm's medical record indicates that a psychiatrist previously assigned Personality Disorder as Sturm's primary condition, that Sturm's most recent hospitalizations resulted in Personality and Adjustment Disorder diagnoses, and that Sturm's primary diagnosis from the VA was for Adjustment Disorder vice Depressive Disorder. *See* A.R. 4, 241, 248–49, 453–59. This evidence was sufficient to support the Correction Board's determination that Sturm's conditions were separable and that only a portion of his overall 30% disability rating was attributable to his Depressive Disorder. *See Biestek*, 587 U.S. at 102–03.

In response, Sturm points to record evidence indicating that he was "diagnosed with depressive disorders at least four times." Pl.'s Mem. 24; *see id.* at 24–25. This evidence, he argues, "stands in contrast to the few cherrypicked items cited by the Board." *Id.* at 24. It is not clear whether Sturm points to evidence of his prior diagnoses to contradict the Correction Board's separability determination, allocation determination, or both. In any event, the evidence is unpersuasive. The fact that Sturm was repeatedly diagnosed with Depressive Disorder does not, without more, undermine the Correction Board's finding that Sturm's conditions were separable. *See Morall*, 412 F.3d at 176 ("[A]n agency decision may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view.").

And, to the extent that Sturm challenges the disability rating attributable to his Depressive Disorder, any error associated with that attribution is harmless. *See supra*.

## CONCLUSION

For the foregoing reasons, the Court denies Sturm's Motion for Summary Judgment, Dkt. 23, and grants the government's Cross-Motion for Summary Judgment, Dkt. 27. A separate order consistent with this decision accompanies this memorandum opinion.

_____
DABNEY L. FRIEDRICH
United States District Judge

September 30, 2025